# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>*ex rel.* RICH CHIBA AND DRAKE )<br>MAPLES, )<br>        )<br>      Plaintiffs, )<br>        )<br>       v.     )<br>        )<br>GUNTERSVILLE BREATHABLES, )<br>INC., )<br>        )<br>      Defendant. ) | **CIVIL ACTION NUMBER**<br>**5:17-CV-00760-HNJ** |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter proceeds before the court on Relators' Motion for Reasonable Expenses, Attorneys' Fees, and Costs (Doc. 26), and their Motion to Strike Portions of Defendants' Response to Relators' Attorney's Fee Petition and Exhibits Accompanying That Response. (Doc. 43). The Defendant alleges the Relators perpetrated the wrongdoing underlying their Fair Claims Act qui tam claims, which disqualifies them from obtaining attorneys' fees. Moreover, the Defendant contends the FCA's government action and public disclosure bars preclude an award of attorneys' fees, and further, the court should reduce the fee request due to the Relators' partial success on their qui tam claims, as well as their lack of billing judgment as to certain hours expended by the Relators' attorneys.

As the analyses herein portray, the Relators secured prevailing party status pursuant to the FCA, entitling them to attorneys' fees, and the FCA does not preclude them from obtaining attorneys' fees due to their alleged wrongdoing. Furthermore, the government action and public disclosure bars do not foreclose the Relators' entitlement to attorneys' fees; pursuant to the terms of the applicable FCA provisions, those prohibitions typically apply to bar qui tam actions and claims, not attorneys' fee requests, and concomitantly, the court has already dismissed with prejudice the qui tam claims to which the prohibitions may apply. Moreover, the prohibitions' terms depict that the bars do not encompass the pre-suit disclosure at issue. Finally, the court will reduce the Relators' attorneys' fees award by some hours attributed to securing their share of the proceeds the Government obtained from the Defendant, yet the court will not reduce the requested award based upon the results the Relators obtained on their qui tam claims.

Therefore, for the reasons set out herein, the court **GRANTS** the Motion for Reasonable Attorneys' Fees, Certain Expenses, and Costs and **MOOTS** the Motion to Strike.

# BACKGROUND

On May 10, 2017, Relators Rich Chiba and Drake Maples commenced this action against Defendants Guntersville Breathables, Inc. (GBI), R. Christopher Lumpkin, and Tori Chase Handley, pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"). Relator Chiba served as GBI's manufacturing vice president from January 2011 to February 2015, and as manufacturing director before that period. Relator Maples worked for GBI from May 2005 to September 2014 as vice president of sales and then chief executive officer.

The complaint alleged GBI and the individual defendants failed to report, for customs duty purposes, the full value of goods imported from China, namely boot-foot waders[1] and insulated knee boots (known as Alaska Tuff Marine boots). GBI declared the value of just one of the component products for the boot-foot wader, allegedly resulting in underpayment of customs duties approximating $700,000. GBI's declaration concerning the Alaska Tuff Marine boots resulted in a tariff rate of 9%, rather than the appropriate personal protective equipment rate of 37.5%, resulting in the underpayment of approximately $200,000 in customs levies. The complaint alleges Defendant Lumpkin (CEO assistant, logistics manager, and freight forwarder)

---

[1] The component products of the boot-foot wader consist of a boot and a garment upper, which attach together to create the final product.

instituted and perpetuated the scheme, with assistance from Defendant Handley (chief financial officer).

The United States intervened and settled with Relators and GBI the undervaluation claim involving the boot-foot waders, regarded by the parties as the Covered Conduct. The settlement released GBI from any civil or administrative monetary claim the United States may pursue for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; 19 U.S.C. §§ 1592 and 1595a of the Tariff Act of 1930, as amended; and the common law theories of unjust enrichment and fraud. GBI agreed to pay the United States $273,495.67, of which $151,942.04 represented restitution.[2] The government gave the Relators a share of the recovery from GBI, amounting to an approximate three point downward departure from the 15% statutory minimum for a relator's share pursuant to the False Claims Act. 31 U.S.C. § 3730(d)(1).

The United States requested the court dismiss with prejudice all claims included in the settlement. However, the United States did not seek the dismissal of any remaining claims in this action beyond the scope of the Covered Conduct, including any claims Relators may have for costs and attorney fees pursuant to 31 U.S.C. § 3730(d)(1), any criminal liability, and any individual liability. The Relators moved to dismiss with

---

[2] The Settlement Agreement contains an exhibit which identifies each boot-foot wader for which GBI failed to report the full value.

prejudice the remaining claims regarding the misclassification of the knee boots as well as any claims against Defendants Lumpkin and Handley. (Doc. 25). The court entered an order on March 19, 2019, granting the United States' and Relators' motions, thereby dismissing all claims with prejudice. (Doc. 36).

The Relators filed their motion for attorneys' fees and costs after dismissal. Throughout this litigation, attorneys Robert E. Battle and Adam P. Plant of Battle & Winn LLP represented Relators. Relators seek attorneys' fees of $85,912.50 for 182.7 hours expended through March 5, 2019, ostensibly excluding time dedicated to non-intervened claims. In particular, Relators seek the following amounts for each attorney and paralegal providing representation and services during this litigation:

| Attorney/Paralegal | Hourly Rate | Hours | Lodestar |
| --- | --- | --- | --- |
| Robert E. Battle | $525 | 39.8 | $20,895.00 |
| Adam P. Plant | $465 | 137.5 | $63,937.50 |
| Amy L. Rodgers | $200 | 3.7 | $740.00 |
| Mariah Hall | $200 | 1.7 | $340.00 |
| | *Totals* | 182.7 | $85,912.50 |

Relators also seek $1,234.41 in costs and expenses and $4,237.50 for expert witness fees. In addition, Relators seek recompense for the fees and costs of litigating their fee petition, which awaits presentation after adjudication of the instant Motion.

# ANALYSIS

The False Claims Act provides the United States Government a right of recovery against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1). In addition, the FCA allows private parties to file a qui tam action and serve as relators to recover damages on behalf of the United States. 31 U.S.C. § 3730(b). Violators of the FCA suffer liability to the government for a civil penalty between $5,000 and $10,000 per claim and treble damages. 18 U.S.C. § 3729(a)(1). In appropriate circumstances, the FCA entitles relators to a percentage of any recovery from a settlement or judgment plus reasonable attorneys' fees and costs. 31 U.S.C. § 3730(d).

As provided in the background, the Government intervened into this action to assume its prosecution, *id.* at § 3730(c), and subsequently reached a settlement with GBI. GBI agreed to pay the United States $273,495.67, and the Relators obtained an approximate 12% share of the United States' recovery. However, GBI argues the Relators should not receive attorneys' fees, or should receive a reduction in attorneys' fees, for various reasons.

As an initial matter, the court must determine whether the Relators are prevailing parties entitled to FCA attorneys' fees. The FCA deems a party a "prevailing" or

successful relator entitled to attorneys' fees and costs in the following applicable circumstances:

> If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. . . .  Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. *Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs.* All such expenses, fees, and costs shall be awarded against the defendant.

31 U.S.C.A. § 3730(d)(1) (emphasis added).  The "starting point in discerning congressional intent is the existing statutory text," and "when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (citations and internal quotation marks omitted); *see also United States v. AseraCare, Inc.*, -- F.3d --, 2019 WL 4251875, at *10 (11th Cir. Sept. 9, 2019) ("The analysis begins with the language of the relevant statute and regulations.") (citation omitted).

Applying the foregoing prescription here, § 3730(d)(1) plainly illustrates the circumstances in which a relator prevails and secures entitlement to attorneys' fees. The first sentence of § 3730(d)(1), which applies to the determination at bar, sets forth the method for calculating a relator's share of proceeds garnered by the United States in

an FCA action in which it has intervened. Then, § 3730(d)(1)'s third sentence states that the United States shall award the relator's share from the actual proceeds received from the FCA defendant. Finally, § 3730(d)(1) declares "[a]ny such person *shall* also receive" attorney's fees, expenses, and costs "awarded against the defendant." *Id.* (emphasis added). As clearly set forth, a prevailing relator entitled to attorneys' fees and expenses includes any person who filed a qui tam action and received a share of the proceeds obtained by the United States from an FCA defendant. *See United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1087 (11th Cir.), *aff'd sub nom. Cochise Consultancy, Inc. v. U.S. ex rel. Hun*, 139 S. Ct. 1507 (2019) ("In an intervened case, *the relator usually is entitled to* . . . proceeds, *as well as reasonable* expenses, *attorney's fees*, and costs.") (citing § 3730(d)(1)) (emphasis added); *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 538, 544 (10th Cir. 2000) ("The only significant difference between the FCA and the attorney's fees provisions in the other statutes is that the FCA provisions are mandatory on their face.").

Prevailing rules of statutory construction buttress this conclusion. The "use of a definite article preceded by an indefinite article can be persuasive evidence that Congress intended to link two clauses." *Schroeder v. United States*, 793 F.3d 1080, 1084-85 (9th Cir. 2015) (citing *Gale v. First Franklin Loan Services*, 701 F.3d 1240, 1246 (9th Cir. 2012)); *see also Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000) ("Indeed, '[i]t is a rule of law well established that the definite article 'the' particularizes the subject

which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'") (quoting *Brooks v. Zabka*, 168 Colo. 265 (1969) (en banc); citing Black's Law Dictionary 1477 (6th ed. 1990) ("In construing [a] statute, [the] definite article 'the' particularizes the subject which it precedes and is [a] word of limitation as opposed to [the] indefinite or generalizing force 'a' or 'an'.")).

In § 3730(d)(1), "*a* person" garners a share of the proceeds obtained by the United States from a defendant, and in the very next sentence "[a]ny *such* person" secures a mandatory entitlement to attorneys' fees, expenses, and costs. 31 § 3730(d)(1) (emphasis added); *see also United States v. Pittman*, 151 F.2d 851, 852 (5th Cir. 1945) ("We cannot throw away the word 'such' [in a statute]. It is descriptive and limiting, referring always to a class just before pointed out."); Black's Law Dictionary (11th ed. 2019) (defining "SUCH" as "That or those; having just been mentioned <a newly discovered Fabergé egg will be on auction next week; such egg is expected to sell for more than $500,000>"); *c.f.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 146 (2012) ("A pronoun that is the subject of a sentence and does not have an antecedent in that sentence ordinarily refers to the subject of the preceding sentence. And it almost always does so when it is the word that begins the sentence."). Because the Relators at bar obtained a share of the proceeds recovered by the Government, they secure an entitlement to attorneys' fees, expenses, and costs.

## A.      Relators' Alleged Involvement Does Not Preclude an Award of Attorneys' Fees and Costs

Notwithstanding the plain meaning of § 3730(d)(1), GBI contends that several other provisions of the FCA preclude the Relators' entitlement to attorneys' fees. First, GBI argues the Relators, not the individual Defendants, perpetrated the fraud underlying the FCA action, and then revealed the fraud after they left GBI's employ. Due to the alleged perpetration of the fraud by the Relators, GBI argues the court should not award them any attorneys' fees.

First, as discussed, § 3730(d)(1) declares that attorneys' fees are mandatory: relators "shall . . . receive" such fees if they obtain a share of the proceeds recovered by the government. *See* Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 9:3 ("Following the Act's reference to an award of part of the 'proceeds of the action or settlement,' the Act provides that such a relator 'shall *also*' receive reasonable attorneys' fees. . . .   A relator whose claim does not result in settlement or a judgment is not entitled to fees.") (emphasis in original) (footnotes omitted); *id.* at § 1.18 ("In addition to a share of the proceeds, the relator is entitled to reasonable expenses, attorneys' fees, and costs, which are to be awarded against the defendant."). Therefore, GBI faces a tough hurdle to circumvent this clear statutory requirement.

This barrier manifests more concretely when examining the structure of the FCA. *See AseraCare, supra*, 2019 WL 4251875, at *10 ("To determine the plain meaning

of a statute or regulation, we do not look at one word or term in isolation, but rather look to the entire statutory or regulatory context.") (citing *Sec. & Exch. Comm'n v. Levin*, 849 F.3d 995, 1003 (11th Cir. 2017)). The FCA actually contains a provision governing relators who participated in the fraud underlying the claim:

> Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation. If the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action. Such dismissal shall not prejudice the right of the United States to continue the action, represented by the Department of Justice.

31 U.S.C. § 3730(d)(3).

As delineated, § 3730(d)(3) authorizes a court in its discretion to reduce a relator's share of the proceeds due to his role in planning or initiating an FCA violation, and to outright deny a share of the proceeds if the relator is held criminally liable for the FCA violation.[3] However, § 3730(d)(3) says nothing about adjusting a relator's

---

[3] A defendant has no standing to challenge a relator's share of the proceeds. *See U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1046 (6th Cir. 1994) (defendant had no legal standing or right to participate in proceedings to determine relator's share); *Mortgages, Inc. v. U.S. Dist. Court for Dist. of Nev. (Las Vegas)*, 934 F.2d 209, 213 (9th Cir. 1991) ("The FCA is in no way intended to ameliorate the liability of wrongdoers by providing defendants with a remedy against a qui tam plaintiff with 'unclean hands.'"); *U.S. ex rel. Mikes v. Straus*, 931 F. Supp. 248, 261 (S.D. N.Y. 1996) (§ 3730(d)(3) "confers no right upon defendants to assert a counterclaim against the relator for the relator's alleged participation

entitlement to attorneys' fees, expenses, and costs.   Sections 3730(d)(1) and (2) govern the relator's entitlement to attorneys' fees, expenses, and costs, and those paragraphs' silence as to a reduction for wrongdoing, as compared to § 3730(d)(3)'s prescriptions, portrays the court cannot countermand the requirement to award attorneys' fees when the Relators obtain a share of the United States' recovery.   *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 439-40 (2002) ("[W]hen one statutory section includes particular language that is omitted in another section of the same Act, it is presumed that Congress acted intentionally and purposely." (citing *Russello v. United States*, 464 U.S. 16, 23 (1983) (same))); *United States v. Spoor Tr. of Louise Paxton Gallagher Revocable Tr.*, 838 F.3d 1197, 1202-03 (11th Cir. 2016) ("'A familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute.'" (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006))).

Of course, if a court had adjudged the Relators criminally liable for an alleged violation of the FCA, § 3730(d)(3) prohibits a share of the award, and by extrapolation, such a finding removes the basis for an award of attorneys' fees pursuant to §

---

in the submission of false claims in violation of the FCA.   Nor can defendants rely on this section to reduce their liability for violation of the FCA."); *U.S. ex rel. Gale v. Omnicare, Inc.*, No. 1:10-CV-127, 2013 WL 3822152, at *9 (N.D. Ohio July 23, 2013) ("The False Claims Act envisions a separate proceeding, after judgment or settlement, to determine the relator's share of any recovery.  '[T]he Relators'-Share Litigation d[oes] not directly involve the qui tam defendants. . . .   [Defendants] ha[ve] no legal standing or right to participate in the proceedings.'") (quoting *Taxpayers Against Fraud*, 41 F.3d 1032, 1046 (6th Cir. 1994) and citing *U.S. ex rel. Vainer v. Da Vita, Inc.*, 1:07–CV–2509–CAP, 2013 WL 1342431 (N.D. Ga. Feb.13, 2013)) (alteration in original).

3730(d)(1). Yet, a court has not criminally adjudged the Relators liable for the FCA violations at issue, so this court has no recourse to reduce their attorneys' fees award due to their alleged wrongdoing.

Indeed, because the FCA does not entirely divest relators who perpetrated the underlying violation from a share of proceeds, awarding such persons attorneys' fees should not be inherently offensive. As § 3730(d)(3) indicates, the FCA's qui tam structure "seeks to tap the self-interest of individuals with information about fraud against the Government, including those who may have been involved in the fraud." Sylvia, *supra*, at § 1.1. "Although many . . . 'relators' who bring qui tam actions may be motivated by public service or a sense of moral duty, Congress did not assume that all relators would be so motivated." *Id.* Therefore, contrary to GBI's arguments that attorneys' fees incentivize relators to serve the public good only, the plain meaning and structure of the statute indicate Congress did not intend withholding of the FCA's attorneys' fee incentive from whistleblowers who perpetrated the violation (unless the whistleblowers warrant criminal liability for the violation). *See* Joel M. Androphy, Federal False Claims Act and Qui Tam Litigation § 2.06 n. 64 ("'Subsection (d)(5) of section 3730 provides that prevailing qui tam relators may be awarded reasonable attorneys [sic] fees in addition to any other percentage of award recovered. . . . Unavailability of attorneys [sic] fees inhibits and precludes many private individuals, as well as their attorneys, from bringing civil fraud suits.'") (quoting S. Rep. No. 99-345,

99th Cong., 2d Sess. 29 (July 28, 1986), *reprinted in* 1986 U.S. Code Cong. & Admin. News 5294).

Therefore, the court cannot heed GBI's entreaty to deny Relators' attorneys' fees due to their alleged wrongdoing. Ferreting out the veracity of GBI's allegations about the Relators vis-a-vis the Relators' averments in the complaint about the dismissed individual defendants would enmesh the court in protracted proceedings disfavored for the adjudication of fee petitions. *See Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation."). Indeed, the Relators' share of the Government's proceeds amounted to less than the 15% statutory minimum, § 3730(d)(1), depicting that the Government may have already relied upon § 3730(d)(3) to reduce the Relator's share based upon participation in the FCA violation. That reduction represents the means to sanction the Relators for any alleged wrongdoing contributing to the FCA violation, and their attorneys should not suffer any detriment therewith in light of the statutory mandate for fees.

### B. The Public Disclosure and Government Action Bars Do Not Preclude Relators' Attorneys' Fees and Costs

In a further bid to deny attorneys' fees, expenses, and costs to the Relators, GBI contends the FCA's government action and public disclosure bars prohibit the Relators from obtaining recovery. The FCA's government action bar requires dismissal of "an action under subsection (b)" – that is, a qui tam action under 31 U.S.C. § 3730(b) –

"which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C.A. § 3730(e)(3). The FCA's public disclosure bar requires dismissal of a § 3730 action or claim – unless the government opposes – "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in one of several enumerated fora. 31 U.S.C.A. § 3730(e)(4). As the following analyses reveal, GBI cannot prevail on its contentions for several reasons.

First, the posture of this case at this juncture casts GBI's reliance upon the § 3730 prohibitions as an anomaly. Section 3730(e)(3)'s government action bar clearly applies to effect dismissal of § 3730(b) qui tam actions, yet the Relators' request for attorneys' fees, etc., arises under § 3730(d). Therefore, at first blush, § 3730(e)(3) may not even warrant dismissal of Relators' attorneys' fees request. The public disclosure bar effects dismissal of an "action or claim" advanced under § 3730, 31 U.S.C. § 3730(e)(4), and a consistent evaluation with other provisions of § 3730 yields the interpretation that "action or claim" references the underlying qui tam action or such a claim presented within an action. *See* 31 U.S.C. § 3130(d)(2) (providing attorneys' fees for a relator who brings an action or settles a claim in which the government does not intervene); *id.* at § 3730(d)(4) (providing attorneys' fees and expenses to a defendant for a relator's claim that "was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment").

Furthermore, a more fundamental anomaly may preclude GBI's attempts to dismiss the attorneys' fees request pursuant to the pertinent § 3730(e) prohibitions. The government action and public disclosure bars serve to facilitate dismissal of qui tam actions and claims charging defendants with FCA violations. Yet, pursuant to a settlement agreement consummated by all of the parties, the United States intervened and moved for dismissal with prejudice of the Relators' pertinent qui tam claims (the boot-foot waders claim). (Docs. 22 & 24). The court granted the United States' motion and dismissed the pertinent qui tam claims with prejudice. (Doc. 36). Therefore, the government action and public disclosure bars serve no purpose at this juncture because the court has already extinguished the Relators' underlying qui tam claims.

In this guise, the Relators' qui tam claims merged into the court's judgment extinguishing the claims with prejudice, and as such, GBI's defenses also dissipated. *C.f.*, Restatement (Second) of Judgments § 18 (1982) ("When the plaintiff recovers a valid and final personal judgment, his original claim is extinguished and rights upon the judgment are substituted for it. The plaintiff's original claim is said to be 'merged' in the judgment. . . . It is immaterial whether the judgment was rendered upon a verdict or upon a motion to dismiss or other objection to the pleadings or upon consent,

confession, or default.").[4]   Therefore, GBI "cannot avail [itself] of defenses [it] might have interposed, or did interpose  . . . ."   Rstmt. (2nd) Jgmt. § 18; *c.f.*, *Key v. Wise*, 629 F.2d 1049, 1063 (5th Cir. 1980) ("Once a lawsuit reaches a final judgment on the merits, the doctrine of res judicata bars litigation in a second lawsuit on the same cause of action 'of all grounds for, or defenses to, recovery that were available to the parties (in the first action), regardless of whether they were asserted or determined in the prior proceeding.'") (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979)); *Todd v. Daewon Am., Inc.*, No. 3:11CV1077-MHT, 2014 WL 2002855, at *2 (M.D. Ala. May 15, 2014) ("The settlement resolved the case, and the company should not be able, after the settlement, to continue its challenge as to whether a particular opt-in plaintiff's claim has merit; otherwise, the settlement would be meaningless.   After the settlement, the merit of any particular claim is no longer relevant.").[5]

---

[4] *C.f.*, *In re All. Res. Mgmt., LLC*, No. 07-61934-JB, 2009 WL 6498529, at *1 (Bankr. N.D. Ga. Dec. 22, 2009) ("The concept of merger provides that when a plaintiff succeeds at litigation and receives a valid and final judgment, the plaintiff's claim merges into the judgment, and the original claim, and all defenses to it, whether asserted or not, are extinguished. In other words, a rendered judgment is 'the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.'") (quoting *Gutherman v. 7-Eleven, Inc.*, 278 F. Supp. 2d 1374, 1377 (S.D. Fla. 2003) (quoting *Kaspar Wire Works, Inc. v. Leco Eng'g and Mach., Inc.*, 575 F.2d 530 (5th Cir. 1978)); (citing 18 James Wm. Moore et. al., Moore's Federal Practice ¶ 131.01 (3d ed. 2009); Black's Law Dictionary 1425 (9 ed. 2009)).

[5] *C.f.*, *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1328 (Fed. Cir. 2008) ("When a former defendant attempts to undermine a previous judgment by asserting in a subsequent action a claim or defense that was or could have been asserted in the earlier case, the rules of defendant preclusion will apply. . . .  'The clearest need for these rules is shown by cases that have involved a variety of direct attacks on the original judgment based on defenses or claims that could have been advanced in the first action.'") (citations omitted).

In sum, once the parties settled the pertinent qui tam claims, the court dismissed the claims with prejudice, and the Relators obtained a share of the proceeds, the Relators became prevailing parties pursuant to § 3730(d)(1), warranting entitlement to attorneys' fees, expenses, and costs. Thus, GBI's effort to invoke the § 3730(e) bars seeks to deny the Relators' prevailing party status. That issue resolved when the parties settled the covered qui tam claims, the court dismissed the claims with prejudice, and the United States accorded Relators a share of the proceeds. Therefore, GBI cannot deny Relators prevailing party status at this stage.

The decisions relied upon by GBI do not caution otherwise; the courts therein dismissed the relators' claims before resolution of the government's FCA allegations, or otherwise denied relators a share of the government's proceeds, thus preventing recognition of the relators as prevailing parties pursuant to § 3730(d)(1). In *U.S. ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97 (3d Cir. 2000), *as amended* (Apr. 21, 2000), the government intervened into a qui tam action, the parties settled the FCA claims, and the government subsequently invoked the public disclosure bar to prevent the relators from obtaining a share of the proceeds. *Id.* at 99-100. The district court rejected the government's invocation and granted the relators a share of the proceeds. The Third Circuit determined the public disclosure bar prohibited the relator's qui tam claims, and thus, reversed the district court's ruling granting relators a share of the proceeds, finding that "a relator whose claim is subject to dismissal under section 3730(e)(4) may not

receive any share of the proceeds attributable to that claim." *Id.* at 106. On its face, *Merena* does not apply to the determination at bar because it does not concern an entitlement to attorneys' fees. Furthermore, in this action the United States accorded Relators a share of the proceeds, thus entitling Relators to attorneys' fees as prevailing parties and further rendering *Merena* inapposite.

In *Fed. Recovery Servs., Inc. v. United States*, 72 F.3d 447 (5th Cir. 1995), the government intervened in an FCA qui tam action, and subsequently the district court dismissed the relator for lack of subject matter jurisdiction due to the public disclosure bar.[6] *Id.* at 449. Thereafter, the government settled the FCA action with the defendant, and subsequently the relator moved to reconsider the jurisdictional dismissal and its attorneys moved for attorneys' fees. *Id.* The Fifth Circuit upheld the district court's dismissal of the relator and denial of attorneys' fees, finding that the relator "was not a proper party to the litigation" due to application of the public disclosure bar prior to settlement; thus, the relator's attorneys were not entitled to fees. *Id.* at 449, 455. Here, of course, all of the parties settled the qui tam claims with prejudice, the United States accorded Relators a share of the proceeds, and hence the Relators comprise proper parties entitled to attorneys' fees.

---

[6] Prior to a 2010 amendment to the FCA, the government action and public disclosure prohibitions constituted jurisdictional bars. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 809-11 (11th Cir. 2015).

In *U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994), an individual joined with Taxpayers Against Fraud ("TAF"), a non-profit corporation, as relators in a qui tam action. *Id.* at 1039. However, the individual relator's attorneys founded TAF, and 95% of TAF's expenses in the qui tam litigation represented fees owed to the same attorneys. *Id.* Based upon these circumstances, the Sixth Circuit ordered the district court on remand to determine "whether TAF had standing to act" as a relator and thus obtain attorneys' fees. *Id.* at 1044. In particular, the court cited another decision determining TAF did not have such standing because the organization did not have any direct and independent knowledge of the fraud and ascertained the FCA violations from the individual relator therein. *Id.* (citing *United States v. Rockwell Int'l Corp.*, 730 F. Supp. 1031, 1035 (D. Colo. 1990)). Clearly, those circumstances do not arise in this case, as the Relators do not remotely constitute attorneys who discovered FCA violations from other individuals.

In *Miller v. Holzmann*, 575 F. Supp. 2d 2 (D.D.C. 2008), *amended in part, vacated in part sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 786 F. Supp. 2d 110 (D.D.C. 2011), the court dismissed relator's qui tam claims against one of six defendants as time-barred, and the government subsequently prevailed on an FCA claim against the same defendant at trial. *Id.* at 5. Post-trial, the relator moved for attorneys' fees against the defendant. The court ruled that the relator could not recover attorneys' fees from the defendant because his claims "were dismissed in their entirety," thus

depicting the relator did not prevail against the defendant. *Id.* at 9. Contrastingly, in this dispute the court dismissed the Relators' qui tam claims with prejudice pursuant to the parties' settlement, and the United States subsequently shared its proceeds with the Relators.

Based upon the foregoing analyses, GBI cannot prevail on the government action and public disclosure bars because all of the parties settled one of the qui tam claims with prejudice. The U.S. accorded Relators a share of the proceeds garnered by the settlement, thus entitling Relators to attorneys' fees.

Moreover, review of the § 3730 prohibitions portrays that GBI cannot sustain its challenge on the merits of the provisions.

### 1. The Government Action Bar Does Not Apply Due to the Lack of a Prior Civil Suit or Administrative Civil Money Proceeding

As referenced previously, the government action bar provides as follows: "In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party." 31 U.S.C. § 3730(e)(3). GBI claims that a "prior disclosure" it filed with the U.S. Customs and Border Protection's Fines, Penalties and Forfeitures Office constitutes an "administrative civil money proceeding" barring the Relators' entitlement to attorneys'

fees. The ensuing analysis portrays that GBI errs in its characterization of its pertinent prior disclosure.

Pursuant to 19 U.S.C. § 1592, which governs certain violations of U.S. duties and tariffs, GBI filed three prior disclosures to remunerate underpayments to U.S. Customs. A 2015 prior disclosure involved the Alaska Tuff Marine boots. (Doc. 42-9 at 9-18). A 2018 prior disclosure involved the undervaluation of the boot-foot waders, which comprises the Relators' qui tam claim settled by the parties. (Doc. 42-9 at 34-39). Of course, the 2018 prior disclosure cannot constitute a predicate for the government action and public disclosure bars because it manifested after the Relators filed their qui tam claims.

As for the pertinent activity at bar, on June 15, 2016, GBI filed a prior disclosure with U.S. Customs disclosing a misclassification of its boot-foot waders -- the product underlying the pertinent qui tam claim settled by the parties -- and therewith remunerated unpaid duties of $656,813.21 and a $97,212.88 interest penalty. As noted by GBI, the FPF office assigned this 2016 prior disclosure a case number. (Doc. 41 at 6). Based upon this 2016 prior disclosure, GBI contends the Government maintained an administrative civil money proceeding regarding the qui tam claim, thus barring the Relators' claim pursuant to § 3730(e)(3)'s government action bar.

Pursuant to the applicable statute, regulations, and decisions relied upon GBI, it cannot prevail on the government action bar. Although GBI's 2016 prior disclosure

reported the transactions containing the boot-wader undervaluation, it does not satisfy the government action bar because prior disclosures under the applicable statutory regime do not constitute administrative civil money penalty proceedings.

In support of its position that prior disclosures in the customs context represent administrative civil money penalty proceedings, GBI cites *Schagrin v. LDR Indus., LLC,* No. 14 C 9125, 2018 WL 2332252, at *2 (N.D. Ill. May 23, 2018) (*Schagrin I*), *adhered to on reconsideration sub nom. United States ex rel. Schagrin v. LDR Indus., LLC*, No. 14 C 9125, 2018 WL 6064699 (N.D. Ill. Nov. 20, 2018) (*Schagrin II*).   In *Schagrin I,* the court ruled the government action bar prohibited the relators' claims because the government pursued the alleged fraud in a prior administrative civil money penalty proceeding.   *Id.* at **1-2. In particular, pursuant to 19 U.S.C. § 1592, U.S. Customs had investigated the defendant's customs violation, imposed penalties against the defendant, and filed a proof of claim in a bankruptcy action spurred by the penalties assessed against the defendant.   *Id.*

However, in *Schagrin II,* the court reversed its ruling and determined that the U.S. Customs' assessment of a penalty against the defendant did not constitute an administrative civil money penalty proceeding.   2018 WL 6064699, at **3-4.   As explained by the court,

> [I]n support of Relators' motion to reconsider, the government has submitted affidavits from U.S. Customs indicating that -- contrary to the Court's May 23 findings -- no penalty proceeding was ever initiated. . . .

> The government contends that a penalty proceeding under 19 U.S.C. § 1592 can be initiated only by issuance of a pre-penalty notice pursuant to 19 U.S.C. § [1592], and no such notice was ever issued to [defendant]. . . . The government contends further that U.S. Customs investigated [defendant] in 2012 and assessed [defendant] for unpaid customs duties. According to the government, the results of this investigation were the basis for the "estimated" potential penalties described in the bankruptcy proof of claim. . . . The government argues that the statements referencing a penalty proceeding concerned "contingent or unmatured" claims that U.S. Customs "might have" but never "actually assessed." * * *

> Defendants apparently do not dispute that U.S. Customs never issued a pre-penalty notice to [defendant]. Defendants also do not contend that investigation prior to the issuance of a pre-penalty notice could constitute a penalty proceeding for purposes of the government action bar under 31 U.S.C. § 3730(e)(3). Absent argument to the contrary from Defendants, the Court agrees with the government and Relators that issuance of a pre-penalty notice pursuant to 19 U.S.C. § 1592 is necessary for a penalty proceeding to be in progress such that the government action bar is implicated. Therefore, since there is no dispute that a pre-penalty notice was never issued, that fact is dispositive of the issue in this case at this point in the proceedings, and the Court must reverse its dismissal of the case based on the government action bar.

*Schagrin II*, 2018 WL 6064699, at *3-4. Therefore, *Schagrin II* extinguished *Schagrin I*'s disposition on the government action bar because U.S. Customs had not initiated a § 1592 penalty proceeding, as evidenced by the lack of a pre-penalty notice. Based upon the absence of a penalty proceeding, *Schagrin II* determined the government had not prosecuted an administrative civil money proceeding.

In the case at bar, U.S. Custom's FP&F office did not issue a pre-penalty notice against GBI pursuant to 19 U.S.C. § 1592. Therefore, pursuant to the same rationale expressed in *Schagrin II*, GBI's 2016 prior disclosure does not incite the government

action bar because FP&F did not initiate an administrative civil money penalty proceeding.   Indeed, the pertinent statute and regulations command this conclusion.

As recounted previously, GBI tendered its prior disclosure pursuant to 19 U.S.C. § 1592.  Title 19 U.S.C. § 1592(a) proscribes the introduction of merchandise in the United States by way of materially false information.  Section 1592(b) sets forth the procedures for processing an alleged violation of § 1592(a).  19 U.S.C. § 1592(b).  In particular, § 1592(b)(1), entitled "Pre-penalty notice," establishes that U.S. Customs may issue "a written notice of its intention to issue a claim for a monetary penalty." *Id.* at § 1592(b)(1).  Upon assessing the alleged violator's response to the pre-penalty notice, § 1592(b)(2), entitled "Penalty claim," provides that U.S. Customs "shall issue a written penalty claim" if it determines a violation occurred.  *Id.* at § 1592(b)(2).[7]  At that juncture, the alleged violator retains an opportunity to seek remission or mitigation of the penalty.  *Id.*   "At the conclusion of any proceeding . . ., the Customs Service

---

[7] *See also* U.S. Customs and Border Protection, Customs Administrative Enforcement Process:  Fines, Penalties, Forfeitures and Liquidated Damages, 25, 26 (2004), *at* https://www.cbp.gov/sites/default/files/documents/icp052_3.pdf:

> While the penalty process generally begins with the FPFO's [Fines, Penalties and Forfeiture Office] issuance of the  Penalty Notice (CF 5955A) to the alleged violator, some statutes require the issuance of a  prepenalty  notice  and opportunity  for  response  before  Customs  makes  its  penalty  claim ( i.e. , issues a penalty notice). * * *

> Upon  receipt  of  the  alleged  violator's  prepenalty  response,  the  FPFO either  will  proceed  to  issue  a  penalty  claim  if  the  violation  is substantiated  or  issue  a  written  statement that Customs  has  chosen  not to assess a penalty.

shall provide to the person concerned a written statement which sets forth the final determination and the findings of fact and conclusions of law on which such determination is based." *Id.* Barring resolution at the penalty claim phase, the United States may seek recovery of the penalty in a proceeding initiated at the Court of International Trade. 19 U.S.C. § 1592(e). Therefore, § 1592 establishes that a "proceeding" does not commence until U.S. Customs issues a pre-penalty notice and subsequently substantiates a claim.

In contrast to the prior statutory provisions detailing a process for adjudicating a claim, the prior disclosure regime falls under the "Maximum penalties" section of the statute. 19 U.S.C. 1592(c)(4). Section 1592(c) largely concerns the penalties applicable to violations of § 1592(a). Section 1592(c)(4), the "Prior disclosure" provision, fashions different penalties for a violator who discloses a § 1592(a) violation "before, or without knowledge of, *the commencement of a formal investigation* of such violation . . . ." *Id.* (emphasis added). Based upon the foregoing statutory provisions, prior disclosures occur before, or outside the auspices of, a formal investigation. As indicated in *Schagrin II*, a § 1592(b)(1) pre-penalty notice initiates a penalty *proceeding*, not a § 1592(c)(4) prior disclosure.

The prior disclosure regulations buttress this conclusion. In particular, U.S. Customs may withhold "prior disclosure treatment" for an entity filing a prior disclosure; in that instance, U.S. Customs commences "a formal investigation of the

disclosed violation [and initiates] a penalty action against the disclosing party . . . ."   19

C.F.R. § 162.74(g).   If such investigation and penalty action ensues, U.S. Customs shall

inform the disclosing entity by attaching a copy of a "'writing' evidencing the

commencement of a formal investigation of the disclosed violation" to the "required

prepenalty notice issued to the disclosing party pursuant to 19 U.S.C. 1592."   19 C.F.R.

§ 162.74(g).   As the regulations indicate, a formal investigation, penalty action, and

associated pre-penalty notice do not commence until U.S. Customs rejects a person's

prior disclosure.

Therefore, pursuant to the statute and regulations, a prior disclosure does not

necessarily instigate an "administrative civil money proceeding" in which the

"government is a party."   31 U.S.C. § 3130(e)(3).   Rather, the government assumes

party status in § 1592 proceedings when U.S. Customs, at the least, commences a formal

investigation of a disclosing person and issues a pre-penalty notice, which evidences the

existence of a penalty action.   Short of such measures, U.S. Customs does not occupy

an adversarial position, and thus, party status, vis-à-vis a prior disclosures.

In the case at bar, the record does not contain any evidence that U.S. Customs

responded to GBI's 2016 prior disclosure by denying prior disclosure treatment,

commencing a formal investigation, initiating a penalty action, and issuing a pre-penalty

notice.   FP&F's assignment of a case number to the 2016 disclosure does not indicate

otherwise, as such designation may merely represent a matter-tracking mechanism.   In

the absence of evidence that FP&F issued a pre-penalty notice establishing the existence of a formal investigation and penalty action, the court does not deem GBI's 2016 prior disclosure an administrative civil money penalty proceeding.

## 2. The Public Disclosure Bar Does Not Apply

GBI's resort to the public disclosure bar suffers even more infirmities than its reliance upon the government action bar. The public disclosure bar provides as follows:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> (iii) from the news media,
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4).

A three-part test governs the § 3130(e)(4) inquiry: (1) whether the plaintiff's allegations or transactions have been publicly disclosed; (2) if so, whether the allegations

in the complaint are "substantially the same" as the allegations or transactions contained in the putative public disclosures; and (3) if yes, whether the plaintiff is an "original source" of that information.   *U.S. ex rel. Osheroff v. Humana Inc.,* 776 F.3d 805, 812 (11th Cir. 2015).

Applying the standard, the first barrier arises as to whether the 2016 prior disclosure was publicly disclosed.   Although information published or distributed by an agency "may be considered publicly disclosed," a transaction does not comprise a "public disclosure when information is reported to a government agency and filed away in a bureaucrat's office."   31 U.S.C.S. § 3730 *Commentary* 168 (LexisNexis 2006).   In this case, the record does not reveal any evidence that U.S. Customs publicly disclosed GBI's 2016 prior disclosure.   The record essentially exhibits a letter and attachments GBI sent to U.S. Customs FP&F, and a couple of forms, titled "Collection Receipt or Informal Entry," indicating the agency's receipt of the letter and attendant checks. (Doc. 42-9 at 20-33).   This evidence does not constitute a public disclosure.   *See United States ex rel. Ortiz v. Mount Sinai Hosp.*, 256 F. Supp. 3d 443, 454 (S.D.N.Y. 2017) ("'[T]he public disclosure bar applies only where there has been a disclosure *outside* of the government.' . . . Defendants' submission of a letter (only), . . . in the circumstances presented here, is insufficient to invoke the public disclosure bar." (quoting *U.S. ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 789 (S.D.N.Y. 2017))) (emphasis in original).

GBI also fails the substantial sameness prong of the public disclosure bar, as the Relators' FCA allegations regarding the boot-foot waders differ from the allegations lodged in the 2016 prior disclosure. As *Osheroff* elucidated, this element queries whether there exists "significant overlap" between the qui tam allegations and the putative, publicly disclosed information. 776 F.3d at 814. The *Osheroff* decision discerned such overlap between media and internet sources – which revealed that defendants' "clinics provided [certain] services, including transportation, meals, entertainment, and spa services, at no cost" to patients – and the relator's qui tam complaint, which alleged "the clinics provided a wealth of free services" in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).[8] *Id.*

Other courts establish similar inquiries for the substantial sameness test. The "First Circuit held that the substantial sameness test bars 'a complaint that targets a scheme previously revealed through public disclosures . . . even if it offers greater detail about the underlying conduct.'" *United States ex rel. Gilbert v. Virginia Coll., LLC*, 305 F. Supp. 3d 1315, 1321 (N.D. Ala. 2018) (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 210 (1st Cir. 2016)). The "Seventh Circuit uses several factors to determine substantial sameness, asking whether the complaint 1) presents genuinely new and material information beyond what has been publicly disclosed; 2)

_____

[8] The Anti–Kickback Statute ("AKS"), 42 U.S.C. § 1320a–7b(b), prohibits knowingly offering or providing remuneration for the purpose of inducing the recipient to purchase a good or service for which payment may be made under a federal health care program.

alleges a different kind of deceit; 3) requires independent investigation and analysis to reveal any fraudulent behavior; 4) involves an entirely different time period than the publicly disclosed allegations; and 5) supplies vital facts not in the public domain." *Id.* (citing *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718–19 (7th Cir. 2017)).

Based upon the foregoing precedent and authority, GBI's 2016 prior disclosure did not reveal information substantially the same as the Relators' revelation in their qui tam complaint. GBI's 2016 prior disclosure involved the misclassification of the boot-foot waders for tariff purposes, as GBI should have classified the items pursuant to a schedule warranting a higher tariff rather than the tariff originally levied. (*See* Doc. 41 at 6, 15; Doc. 42 at 11; ¶ 35; Doc. 42-5 at 12 ¶ 38; Doc. 42-10 at 7 ¶ 26; Doc. 42-13 at 14, ¶ 40; 15 ¶ 50.). The Relators' claims in the qui tam complaint, however, involve the undervaluation of the boot-foot waders, whereby GBI failed to disclose the full value of the item for customs duty purposes. (Doc. 1 at 14-18). GBI readily admits the misclassification issue at the center of the 2016 prior disclosure differs from the qui tam complaint's undervaluation issue settled by the parties. (Doc. 41 at 15; Doc. 42-13 at 14, ¶ 40; 15 ¶ 50).

Pursuant to the foregoing standards, this distinction between a tariff misclassification and a duty undervaluation as to the boot-foot waders does not evince a significant overlap between the issues, as the transgressions warranted different and

separate penalties. Furthermore, the distinction between misclassification and undervaluation reveals the qui tam complaint and the 2016 prior disclosure did not target the same scheme. Moreover, pursuant to the Seventh Circuit's standard, the qui tam complaint's allegations as to the boot-foot wader undervaluation present genuinely new and material information beyond the 2016 prior disclosure regarding misclassification, and allege a different kind of "deceit" vis-à-vis the prior disclosure. For all of the foregoing reasons, the 2016 prior disclosure regarding the boot-foot wader's misclassification did not involve substantially the same averments lodged in the qui tam complaint.

Finally, the Relators qualify as original sources of the information provided in their qui tam complaint on both definitions provided by the statute. As to the first definition, an original source constitutes an individual who "prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." 31 U.S.C. § 3730(e)(4)(B). As countenanced previously, GBI's 2016 prior disclosure did not constitute a public disclosure pursuant to § 3730(e)(4), and it did not concern the undervaluation of the boot-foot waders. Therefore, the Relators voluntary disclosed the undervaluation information to the Government prior to any public disclosure.

As for the other definition, an original source constitutes an individual "who has knowledge that is independent of and materially adds to the publicly disclosed

allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." *Id.* The Relators disclosed the undervaluation issues to the Government before filing their qui tam complaint. Moreover, that their information involves undervaluation – not misclassification – of the boot-foot waders evinces independent knowledge that materially adds to the 2016 prior disclosure. Therefore, the Relators qualify as original sources, and for this additional reason, GBI cannot prevail on the public disclosure bar.

## C. The Relators' Partial Success on One Claim Only Does Not Warrant a Downward Departure in the Attorneys' Fees Award

As a final matter, GBI contests several aspects of the Relators' specific attorneys' fees request. "The general rule in our legal system is that each party must pay its own attorney's fees and expenses." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010). As discussed previously, however, the FCA entitles a successful qui tam relator to attorneys' fees. 31 U.S.C. § 3730(d)(1).

Generally, determining reasonable attorneys' fees requires calculation of a "lodestar figure," which is determined by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The "lodestar method yields a fee that is presumptively sufficient to achieve [the] objective" of inducing capable attorneys to undertake representation of FCA relators. *Perdue*, 559 U.S. at 552 (citations omitted). "'[T]he lodestar figure includes

most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee.'" *Id.* at 553 (citation omitted). Thus, "the lodestar method produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Id.* at 551 (emphasis in original). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437.

Relators seek only the lodestar amount, without any request for upward adjustment.[9] (Doc. 27 at 18). Defendants do not challenge the reasonableness of the hourly rates. (*See* Doc. 41). Indeed, they describe Realtors' counsel as "exceptionally capable and well-respected" and "due to be paid for their work." (Doc. 41 at 2). Furthermore, GBI does not dispute the reasonableness of the Relators' standard costs and expenses, $1,234.41, or the reasonableness of $4,237.50 expended for Relators' expert witnesses regarding the fee petition. (Doc. 41 at 25). However, GBI challenges some of the recorded attorney hours, and it seeks a fee reduction based on the results obtained.

Specifically, GBI seeks a reduction for any redundant or duplicative time entries expended by Relators' attorneys, including an identical 8.6 hours reported by both

---

[9] The law allows the court to award an upward adjustment to a fee in cases of exceptional success. *Blum v. Stenson*, 465 U.S. 886, 897-98 (1984).

attorneys Robert Battle and Adam Plant on the same date. GBI essentially questions the attorneys' billing judgment, as "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary . . . ." *Hensley*, 461 U.S. at 434.

The contested entries represent the attorneys' travel time and initial meeting with the Relators.[10] "An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation." *Johnson v. Univ. Coll. of Univ. of Alabama in Birmingham*, 706 F.2d 1205, 1208 (11th Cir. 1983), *holding modified by Gaines v. Dougherty Cty. Bd. of Educ.*, 775 F.2d 1565 (11th Cir. 1985). In this case, Battle and Plant both contributed their expertise in complex litigation, including FCA cases; thus, the court cannot fault the attorneys for both meeting potential clients at an initial meeting. An initial meeting with a client carries great import, and the court finds it was not unreasonable for both attorneys to participate in this initial meeting. As for the rest of the time entries, the court does not discern any other duplicative or redundant entries.

GBI further requests exclusion of 89 hours from Battle's and Plant's entries, claiming this time arose in a period from May 10, 2017, to February 25, 2019, during which GBI performed all of the discovery and negotiations resulting in the settlement of this case. The records do not support GBI's contention, as they portray Battle's

---

[10] The court has reviewed in camera unredacted copies of Battle's and Plant's time records.

and Plant's engagement with this action by interacting with the Government and their clients; reviewing, analyzing, and revising settlement agreement drafts provided by the Government; and researching and discussing attorneys' fee issues. These records do not evince "ministerial" tasks, as argued by GBI, and therefore, the court will not excise these hours from the fee application.

However, the Relators cannot obtain recompense for the time Plant and Battle spent negotiating and processing the Relators' share of the proceeds. *See United States ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc.*, 87 F. Supp. 2d 351, 358 (D. Vt. 2000); *United States ex rel. Thompson v. Walgreen Co.*, 621 F. Supp. 2d 710, 726 (D. Minn. 2009); *see also Taxpayers Against Fraud*, 41 F.3d at 1044-46; *Miller*, 575 F. Supp. 2d at 26 (time spent negotiating relator's share non-compensable because defendant had no right to participate in the process and nothing suggested defendant had prolonged the process or could have hastened its conclusion). Plant expended 4.5 hours and Battle expended .2 hours on Relators' share matters, which the court will disallow as part of the claimed fees. This reduces the fees by $2,197.50 (4.5 hours x $465 plus .2 hours x $525).

Most critically for the assessment at bar, a court may adjust the lodestar amount "downward depending on the 'results obtained,'" *United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1292 (11th Cir. 2017) (quoting *Hensley*, 461 U.S. at 434), a factor "particularly crucial where a plaintiff is deemed 'prevailing' even though [succeeding] on only some of [the] claims for relief." *Hensley*, 461 U.S. at 434. "In this situation two questions

must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Id.*

As for the first question, "a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories." *Id.* "In such a suit, . . . counsel's work on one claim will be unrelated to his work on another claim." *Id.* at 435. "Accordingly, work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved,' . . . requir[ing] that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." *Id.* (citation omitted).

Regarding this first question, GBI contends the Relators only prevailed on one of the two schemes it averred in the qui tam Complaint. As discerned, the issue regarding the boot-foot waders involved an undervaluation, whereas the Alaska Tuff Marine boots involved a misclassification. The settlement did not involve any claims regarding the Alaskan Tuff Marine boots, and the subsequent dismissals in this case occasioned no relief for Relators regarding the scheme.

Relatedly, GBI contends the Relators only prevailed on one of five, separate claims alleged in the Complaint. The five claims comprise the following: the qui tam Complaint's Count I averred an FCA violation against GBI and the two individual

defendants regarding the undervaluation of the boot-foot waders and misclassification of the Alaska Tuff Marine boots, and Count II averred an FCA conspiracy charge against the two individual defendants regarding the undervaluation and misclassification. (Doc. 1 at 25-27).

The Relators assert they have excised 9.5 hours from their fee request to reflect the dismissal of the non-intervened, non-settled claims regarding the misclassification of the Alaska Tuff Marine boots. Beyond this expungement, the Relators argue the schemes share a common legal theory, and thus, they are interrelated and incapable of separation. Therefore, they did not excise any attorney hours for the unsuccessful claim vis-à-vis the drafting and editing of the Complaint; the preparation of the Relators for their interviews and statements; and the preparation of the Civil Investigative Demand, all of which presumably included review, authoring, and discussion of facts regarding the unsuccessful claim. Of the 116 paragraphs in the Complaint, 13 correspond solely to factual averments regarding the unsuccessful claim, not including an introductory section containing a paragraph devoted solely to the unsuccessful claim. (Doc. 1 at 4 & ¶¶ 32, 39-41, 46-47, 62-68). Nevertheless, the hours recorded for the afore-described activities do not delineate between time expended on the successful claim and the non-intervened, non-settled claim, and thus, the court cannot separate such time.

In any event, further separation is not warranted because the successful claim

regarding the boot-foot wader intertwines with the unsuccessful claim regarding the Alaska Tuff Marine boot. Pursuant to *Hensley*, where the prevailing party's "claims for relief . . . involve a common core of facts *or* [are] based on related legal theories," such that "counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis[,] . . . the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." 461 U.S. at 435 (emphasis added); *see also Popham v. City of Kennesaw*, 820 F.2d 1570, 1578 (11th Cir. 1987) ("If the claims on which the plaintiff did not prevail and the claims on which he did prevail were 'distinctly different claims . . . based on different facts and legal theories,' the court cannot award any fee for services on the unsuccessful claims. . . . However, if the unsuccessful and the successful claims 'involve a common core of facts' *or* are 'based on related legal theories,' the court must compare the plaintiff's overall relief with the number of hours reasonably expended on the litigation.") (quoting *Hensley*, 461 U.S. at 434-35) (emphasis added).

In this case, the Relators' claims involve related legal theories and a common core of facts. As for the related legal theory, both claims involved violations of 19 U.S.C. § 1592, which proscribes the introduction of merchandise in the United States by way of materially false information. Section 1592(c) sets forth the penalties applicable to § 1592 violations, and as recounted previously, GBI tendered prior disclosures regarding

the claims pursuant to § 1592(c)(4).

Furthermore, the very nature of the claims portrays the existence of related legal theories and a common core of facts, and a concomitant difficulty with dividing the hours expended on a claim-by-claim basis. The Relators advanced an FCA qui tam action, which by its very nature requires allegations that a defendant knowingly submitted false or fraudulent claims to the government for payment or approval. 31 U.S.C. § 3729(a)(1). Federal Rule of Civil Procedure 9(b) governs complaints alleging violations of the FCA. *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (citation omitted). Pursuant to Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To state a claim under the False Claims Act with particularity, the complaint must allege facts as to time, place, and substance of the defendant's alleged fraud, and the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Corsello*, 428 F.3d at 1012.

Therefore, the nature of fraud, and the requirements for pleading and proving fraud, reveal the inter-relation of the boot-foot waders and Alaska Tuff Marine boots claims. The Relators proceeded with the theory that the undervaluation of the boot-foot waders and misclassification of the Alaska Tuff Marine boots comprised one fraudulent scheme perpetrated by GBI. Furthermore, the Relators contended that the dismissed, individual defendants perpetrated the inter-related scheme regarding the

boot-foot waders and the Alaska Tuff Marine boots, demonstrating that the court cannot separate the claims factually. Although the allegations regarding the individual defendants may very well be untrue, GBI settled the intervened, FCA claim regarding the boot-foot waders. The court need not engage in a protracted proceeding determining the true wrongdoers when the intervened claim conceptually encapsulates the unsuccessful claim both legally and factually. That is, some coterie of GBI officers falsely reported information to U.S. Customs regarding the boot-foot waders and the Alaska Tuff Marine boots, and although GBI settled the former only, the Complaint alleges the same wrongdoers perpetrated the activities underlying both claims.

Therefore, the court must proceed to the second *Hensley* question, that is, to compare the Relators' overall recovery with the number of attorney hours reasonably expended on the litigation to assess whether the level of success warrants the requested fee award. When "the prevailing party achieved only a 'partial or limited success,' the lodestar figure 'may be an excessive amount' because 'the *most critical factor is the degree of success obtained*.'" *Everglades College*, 855 F.3d at 1292 (quoting *Hensley*, 461 U.S. at 436) (emphasis in original). "Moreover, when the district court 'reduces the award to account for the limited success, the court necessarily has discretion in making this equitable judgment.'" *Id.* (quoting *Hensley*, 461 at 436–37) (internal alterations omitted).

Nevertheless, "the Supreme Court has frowned on a strictly mathematical

approach calculating attorney's fees based on a ratio of total claims to successfully litigated ones, explaining that 'such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors.'" *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1164 (11th Cir. 2017) (quoting *Hensley*, 461 U.S. at 435 n. 11) (internal alterations omitted). Therefore, "while the amount of damages is relevant to assessing the degree of success enjoyed by the plaintiff, the 'court may not employ a cash register approach in which setting a fee is merely an arithmetical function.'" *Id* (quoting *Cullens v. Georgia Dept. of Trans.*, 29 F.3d 1489, 1493 (11th Cir. 1994)). "'The risk is too great that a multiple-of-damages approach will subsume, or override, or erode other relevant considerations, or place undue tensions upon them' even if 'the use of the multiplier is explained and justified.'" *Id.* (quoting *Cullens*, 29 F.3d at 1494) (internal alterations omitted).

Based upon the foregoing principles, GBI contends the Relators' partial, limited success on their claims warrants a 75% reduction in the lodestar, primarily due to success on only one of five claims, and the recovery of only $273,495.67 when the qui tam Complaint sought nearly $1 million in damages for the alleged claims. However, as forewarned, the precedent forestalls "calculating attorney's fees based on a ratio of total claims to successfully litigated ones." *Yellow Pages*, 846 F.3d at 1164. Heeding the instructions in *Everglades College* to consider all applicable circumstances and policy considerations, 855 F.3d at 1293, the court declines to adjust the Relators' lodestar

downward.

As an initial matter, the Government and the Relators did not secure a mere "technical" victory upon settlement of the qui tam claim. *Id.* at 1292. As provided in *Everglades College*, technical victories comprise recoveries of nominal damages, or statutory penalties as in the decision itself, rather than actual damages. *Everglades College*, 855 F.3d at 1284, 1292 (statutory penalties amounted to $11,000 recovery for Government)(citing *Farrar v. Hobby*, 506 U.S. 103, 114-15 (1992) (nominal damages do not constitute actual damages)). In this case, the Government and the Relators secured restitution in the amount of $151,942.04, and a near 100 percent multiplier in the amount of $121,553.63, which together totaled $273,495.67. This sum represents more than a technical victory for the Government and the Relators. Indeed, in *Everglades College* itself, the Court upheld the relators' downward-adjusted $60,000 fee award for the $11,000 in statutory penalties secured by the relators at trial. *Id.* at 1292-93. [11] Surely, the $273,495.67 recovery here represents a greater degree of success, and the application for approximately $85,000 in attorneys' fees constitutes a substantially more modest request than the $1 million in fees sought in *Everglades College*.

---

[11] To be sure, in *Everglades College* the government intervened after the district court fashioned it attorneys' fee award and secured a settlement with the defendant for $335,000. *United States v. Everglades Coll., Inc.,* 855 F.3d 1279, 1284-85 (11th Cir. 2017). Based upon this larger settlement, the relators sought enhanced attorneys' fees and costs, but the "district court denied that request on the ground that Relators objected to the settlement at every stage of the proceedings and should not reap the benefits of an outcome they so vigorously sought to prevent." *Id.* at 1285. Those circumstances do not arise in the case at bar, as the Relators were parties to, and approved, the Government's settlement with GBI.

More importantly, the Relators achieved a significant public benefit for the United States. As the Eleventh Circuit declares, "public benefit . . . is an important measure of success" in an action underlying an attorney's fees petition. *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1307 (11th Cir. 2001) (citing *Popham*, 820 F.2d at 1580). Successful litigation of an FCA qui tam claim certainly serves a public benefit. The FCA prevents the United States Treasury from being drained of millions of dollars by fraudulent billings or omissions by federal government contractors and commercial entities. *See* S. Rep. No. 345, 99th Cong., 2d Sess. 3, *reprinted in* 1986 U.S. Code Cong. & Admin. News 5266, 5268. In furtherance of that purpose, Congress strengthened the FCA in 1986 by revamping its qui tam provisions to encourage private individuals to bring suits on behalf of the government. *See United States ex rel. McCoy v. California Medical Review, Inc.*, 715 F. Supp. 967, 968 (N.D. Cal.1989) ("Congress' objectives in amending the Act [were] principally to expand the role of qui tam plaintiffs and to keep pressure on the United States to prosecute the cases") (citing S. Rep. No. 99–345, 99th Cong., 2d Sess. 24, *reprinted in* 1986 U.S. Code Cong. & Admin. News 5266, 5289). Congress noted that "much of the purpose of qui tam actions would be defeated unless the private individual is able to advance the case to litigation." S. Rep. No. 99–345, 99th Cong., 2d Sess. 24, *reprinted in* 1986 U.S. Code Cong. & Admin. News 5266, 5289.

In this case, the Relators' successful qui tam claim occasioned a significant public benefit for the United States. As described previously, the United States obtained

restitution in the amount of $151,942.04, and a near 100 percent multiplier in the amount of $121,553.63, totaling $273,495.67. More significantly, the nature of the recovery indicates its significance. As recounted previously, GBI had issued prior disclosures to U.S. Customs to pay duties and tariffs on the misclassified boot-foot waders and the Alaska Tuff Marine boots. Laudable as this effort may be, the prior disclosures still did not report the undervaluation of the boot-foot waders. Therefore, even though GBI's prior disclosures included the same boot-foot waders transactions underlying the successful claim at bar, GBI failed to disclose to U.S. Customs the undervaluation aspect of the transactions. The Relators' qui tam claim revealed the undervaluation, and its revelation amounted to a recovery of close to $273,495.67. This recovery represents a significant public benefit given the failure of GBI's prior efforts at disclosure to reveal the undervaluation.

Considering the "'policy considerations on all sides (including the encouragement of whistle-blowers, . . . and considerations of judicial economy), and the fact that the suit may have had a positive impact on [GBI's] conduct," *Everglades College*, 855 F.3d at 1293 -- particularly as it failed to disclose the boot-foot waders' undervaluation even after disclosing another issue with the product -- the Relators' fee application does not warrant a downward departure.

Therefore, based upon the foregoing evaluation, the court will preliminarily award the following attorneys' fees to the Relators, subject to a subsequent application for attorneys' fees, expenses, and costs in litigating the instant application:

| Attorney/Paralegal | Hourly Rate | Hours | Lodestar |
|---|---|---|---|
| Robert E. Battle | $525 | 39.6 | $20,790.00 |
| Adam P. Plant | $465 | 133 | $61,845.00 |
| Amy L. Rodgers | $200 | 3.7 | $740.00 |
| Mariah Hall | $200 | 1.7 | $340.00 |
| | *Totals* | 178 | $83,715.00 |

### D.    Motion to Strike

Because the court adjudicated GBI's contention that the court should not award Relators' fees, costs, and expenses because they allegedly participated in the conduct giving rise to this action, the court **DENIES** the Relators' Motion to Strike as **MOOT**. However, the court **DIRECTS** the Clerk to maintain Doc. 42 under seal.

## CONCLUSION

Based on the foregoing analysis, the court **GRANTS** Relators' Motion for Reasonable Expenses, Attorneys' Fees, and Costs.   The court preliminarily **AWARDS** attorneys' fees against GBI in the amount of $83,715.00, costs and expenses against GBI in the amount of $1,234.41, and expert witness fees against GBI in the amount of $4,237.50.

Relators shall file their final petition seeking reimbursement for fees and costs incurred after March 5, 2019, in litigation of the fee petition, within fourteen (14) days from the entry date of this order.   Defendants shall file any response within seven (7) days thereafter.

**DONE** this 9th day of October, 2019.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE